UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

BHUPAT R. BHATTI,

          Plaintiff,

     v.

COUNTY OF SACRAMENTO, SELEENA
ULAHANNAN, and DOES 1 to 50,

          Defendants.

NO. CIV. S-05-754 WBS PAN (JFM)

MEMORANDUM AND ORDER RE:
MOTION FOR SUMMARY JUDGMENT

----oo0oo----

          Plaintiff Bhupat R. Bhatti alleges several causes of
action against defendants, including violation of plaintiff's
federal and state constitutional rights, actionable under 42
U.S.C. § 1983 and California Civil Code § 52.1, negligence, and
intentional and negligent infliction of emotional distress.
(Compl.)  Pursuant to Federal Rule of Civil Procedure 56(c),
defendants County of Sacramento and Seleena Ulahannan now move
for summary judgment, maintaining that Ulahannan is entitled to
various immunities for her actions taken as a social worker.  The
court agrees that absolute and qualified immunity attaches to
Ulahannan's conduct and that plaintiff has failed to state a

1

claim against the County defendant.  For the following reasons,
summary judgment is warranted.

I.   Factual and Procedural Background[1]

Approximately two months after marrying Kulwinder
Bhatti in India, plaintiff returned to the United States without
his wife.  (Defs.' Statement of Undisputed Facts ("SUF") Nos. 1-
2.)  Eight months later, in November of 1997, Kulwinder gave
birth to the couple's son, Ammon Bhatti.  (Defs.' SUF No. 3.)
Kulwinder raised Ammon in India, largely without plaintiff, until
March 2003.  (Defs.' SUF No. 4.)  At that time, after two
extended visits to India, plaintiff arranged for Kulwinder and
Ammon to relocate to the United States.  (Defs.' SUF No. 5.)  The
Bhattis then shared a home in Sacramento, California with

---

[1]     As an initial matter, the court notes that defendants
have raised dozens of "Objections to Plaintiff's Response to
Defendants' Statement of Undisputed Facts."  But despite
defendants' efforts to couch their arguments in terms of
evidentiary objections, they largely attack only the sufficiency,
not the admissibility, of plaintiff's facts.  For example, under
the heading "Objections" defendants repeatedly contend that
plaintiff's evidence does not create "a substantial controversy
of fact" or alternatively, a dispute of material fact.  (Defs.'
Objections No. 62.)  These are simply arguments in furtherance of
their motion for summary judgment--not evidentiary objections.

Moreover, with the exception of their objections to the
declaration of Meena Kumari Bhatti (on which the court has not
relied), defendants primarily target plaintiff's response to
defendants' statement of undisputed facts and not the underlying
affidavits on which these statements are based.  A plaintiff's
statement of disputed facts is not evidence, the admissibility of
which can be challenged under the Federal Rules of Evidence.  See
also Perma Research & Dev. Co. v. Singer Co., 410 F.2d 572, 579
(2d Cir. 1969) (holding that objections to an affidavit submitted
on a motion for summary judgment "must be precise" and "specify
which parts of the . . . affidavit should be stricken and why"
(emphasis added)); 10B Charles Alan Wright et al., 10B Federal
Practice and Procedure § 2738 (3d ed. 1998 & Supp. 2005) ("[A]
motion to strike should specify the objectionable portions of the
affidavit and the grounds for each objection.").  Consequently,
defendants' "objections" are not well taken and are overruled.

1 plaintiff's brother, Sudesh Bhatti, and his family. (Defs.' SUF
2 No. 6.)

3        On August 29, 2003, Ulahannan, a social worker for the
4 County of Sacramento, responded to an Emergency Response Referral
5 regarding the potential abuse of Ammon by his mother.  (Defs.'
6 SUF No. 43.)  The referral alleged that Kulwinder emotionally
7 abused, threatened to kill, and generally neglected her son.
8 (Defs.' SUF No. 41.)  When Ulahannan arrived at the Bhatti
9 residence and interviewed Kulwinder and Ammon, both denied abuse
10 on the part of Kulwinder.  (Defs.' SUF No. 56.)  However, both
11 Kulwinder and Ammon alleged plaintiff was physically and
12 emotionally abusive towards them.  (Id.)  During this
13 conversation, Kulwinder advised Ulahannan that she was scared and
14 desired to leave the Bhatti residence.  (Defs.' SUF No. 56.)

15        Ulahannan then contacted plaintiff, who returned to the
16 Bhatti residence for an interview. (Defs.' SUF No. 60.)  During
17 the course of this interview, Kulwinder again expressed her
18 desire to leave the Bhatti residence and requested assistance
19 from Ulahannan.  (Defs.' SUF No. 67.)  Some form of dispute
20 between either Ulahannan and plaintiff or plaintiff and Kulwinder
21 concerning control over passports followed and in response,
22 Ulahannan requested and received assistance from law enforcement.
23 (Pl.'s Resp. to Defs.' SUF Nos. 63-64.)

24        In Ulahannan's opinion, after over 3 hours of
25 interviewing Kulwinder, Ammon, plaintiff, and plaintiff's
26 brother, there was no evidence of the allegations of abuse made
27 by the reporter--Kulwinder appeared stable and "very bonded" with
28 her child.  (Ulahannan Decl. ¶ 6.)  In contrast, Ulahannan

3

believed that she had uncovered evidence of domestic abuse
perpetrated by plaintiff and that she faced a situation where the
wife was anxious to leave a seemingly hostile environment.
Accordingly, after a conference between Ulahannan's supervisor
and the Emergency Response Program Manager, Kulwinder and Ammon
were offered, and Kulwinder accepted, transportation from the
home.  Mother and son were eventually delivered to a Women
Escaping A Violent Environment ("WEAVE") shelter.  (Defs.' SUF
No. 75.)  While these plans were being formulated, plaintiff and
his family vociferously objected to the "removal" of Ammon, who
was crying and making declarations in Punjabi, a language not
understood by Ulahannan.[2]

        This was not the first time that police had been to the
Bhatti residence.  Just three days prior, law enforcement
officers had responded to another call, also made by plaintiff's
sister-in-law Suzanne Bhatti, in which the caller made the same
allegations against Kulwinder that prompted the August 29th CPS
visit.  (Defs.' SUF No. 20.)  Like Ulahannan, the officers found
no evidentiary support for Suzanne's accusations.  (Pl.'s Resp.
to Defs.' SUF No. 31.)  However, plaintiff's complaint does not
appear to implicate the officers involved in either visit.

        In the months following the visits by law enforcement
and CPS, plaintiff fought to regain custody over Ammon.  His

_____

        [2]   The parties dispute the content of Ammon's statements.
Plaintiff and his family members assert that Ammon was saying
that he wanted to stay with "daddy" while Kulwinder claims that
he said "I want to go with you."  (Compare Sudesh Bhatti Decl. ¶
16, with Kulwinder Bhatti Decl. ¶ 6.)  Nevertheless, the parties
do not dispute that Ulahannan did not know what Ammon was saying
at this point.

visitation rights were limited to one day a week.  (Bhupat Bhatti
Decl. ¶ 38.)  Additionally, Family Court Services ("FCS") worker
Joyce Medari recommended domestic violence counseling for
plaintiff and his name was submitted to the Child Abuse Central
Index in December, 2003.  (Id. ¶ 38, 67.)

Eventually, plaintiff and Kulwinder sought to dissolve
their marriage and the court settled, inter alia, the custody
battle over Ammon.  Plaintiff was awarded joint custody,
consisting of "parenting time . . . every weekend from Friday at
6:00 p.m. to Sunday at 6:00 p.m."[3]  (Zal Decl. Ex. 4 (In re
Bhatti, No. 03-FL-05779, slip op. ¶¶ 3-4 (Cal. Super. Ct. June
14, 2004).)  Additionally, the court found that there was "no
domestic violence" and further declared that the FCS report and
CPS evaluations/findings were "unfounded" and "not to be used or
considered in further evaluations or mediations."  (Id. ¶¶ 6, 8.)

Plaintiff next took his legal battle to federal court,
where he filed the instant action on April 19, 2005.  Plaintiff
seeks $4 million in compensatory damages and $1 million in
punitive damages based on the following claims: (1) violation of

_____

[3]    Plaintiff's declaration that he "was afforded primary
custody of Ammon" and that the evaluating psychologist "found
that [he] was a much better parent than Kulwinder" is not
supported by the evidence accompanying this motion or plaintiff's
opposition.  (See Bhupat Bhatti Decl. ¶ 39.)  As noted above, the
family court order plainly awards joint custody to Ammon's
parents and allotted plaintiff only two out of seven days a week.
Because the order does not specify guardians other than Kulwinder
and Bhupat Bhatti, the court can only assume that Kulwinder has
custody during the rest of the week.  (Zal Decl. Ex. 4 (In re
Bhatti, No. 03-FL-05779, slip op. ¶¶ 3-4 (Cal. Super. Ct. June
14, 2004).)  Although the order was temporary, plaintiff has not
submitted evidence showing that it was amended.  (But see Compl.
¶ 11 (alleging that plaintiff "presently has 70% physical custody
of Ammon").)

1   his Fourth and Fourteenth Amendment rights, actionable under 42

2   U.S.C. § 1983; (2) violation of his federal and state civil

3   rights, actionable under Cal. Civ. Code §§ 52.1 et seq.; (3)

4   negligence; (4) intentional infliction of emotional distress; and

5   (5) negligent infliction of emotional distress.  Defendants now

6   move for summary judgment, arguing that defendant Ulahannan is

7   entitled to either absolute or qualified immunity and that

8   plaintiff failed to plead, and alternatively cannot prove, a

9   Monell claim against defendant County.  See Monell v. Dep't of

10  Soc. Servs. of N.Y., 436 U.S. 658, 694 (1978).

11  II.  Discussion

12       A.   Legal Standard

13            Summary judgment is proper "if the pleadings,

14  depositions, answers to interrogatories, and admissions on file,

15  together with the affidavits, if any, show that there is no

16  genuine issue as to any material fact and that the moving party

17  is entitled to judgment as a matter of law."  Fed. R. Civ. P.

18  56(c).  A material fact is one that could affect the outcome of

19  the suit, and a genuine issue is one that could permit a

20  reasonable jury to enter a verdict in the non-moving party's

21  favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

22  (1986).

23            The party moving for summary judgment bears the initial

24  burden of establishing the absence of a genuine issue of material

25  fact and can satisfy this burden by presenting evidence that

26  negates an essential element of the non-moving party's case.

27  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

28  Alternatively, the movant can demonstrate that the non-moving

6

1  party cannot provide evidence to support an essential element

2  upon which it will bear the burden of proof at trial.  Id.

3  Any inferences drawn from the underlying facts must, however, be

4  viewed in the light most favorable to the party opposing the

5  motion.  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,

6  475 U.S. 574, 587 (1986).

7       B.   Section 1983 Claims

8            Defendants argue that qualified, and in some instances

9  absolute, immunities bar plaintiff's § 1983 claim.  The Ninth

10 Circuit has held that social workers enjoy absolute immunity for

11 "discretionary, quasi-prosecutorial decisions", Miller v.

12 Gammie, 335 F.3d 889, 898 (9th Cir. 2003) (citing Meyers v.

13 Contra Costa County Dep't of Soc. Servs., 812 F.2d 1154, 1157

14 (9th Cir. 1987)), and for "'quasi-judicial' actions in the

15 context of child welfare proceedings," Caldwell v. LeFaver, 928

16 F.2d 331, 333 (9th Cir. 1991).  However, the scope of this

17 immunity is "extremely narrow."  Miller, 335 F.3d at 898.  Thus,

18 while social workers may claim absolute immunity, for example,

19 for decisions to institute dependency proceedings and for

20 submissions made to a court, they are not similarly protected

21 when they take actions to detain juveniles prior to any

22 dependency proceedings.  Doe v. Lebbos, 348 F.3d 820, 825-26 (9th

23 Cir. 2003); Miller, 335 F.3d at 898; cf. Broam v. Bogan, 320 F.3d

24 1023, 1028 (9th Cir. 2003) (holding that prosecutorial immunity,

25 on which social worker immunity is partially based, does not

26 extend to investigatory or administrative functions separate from

27 a prosecutor's role as judicial a advocate).

28            More generally, social workers are also entitled to the

immunities afforded to testifying witnesses.  See Holt v.
Castaneda, 832 F.2d 123, 125 (9th Cir. 1987) (holding that
"officer witnesses enjoy the same absolute immunity from
liability under section 1983 that private witnesses enjoy").
Significantly, witnesses who simply testify in an adversarial
setting are afforded immunity for their testimony--including
false testimony.  White v. Frank, 855 F.2d 956, 958 (2d Cir.
1988); see also Burns v. County of King, 883 F.2d 819, 822 (9th
Cir. 1989) (noting that the Ninth Circuit has extended witness
immunity to adversarial pretrial proceedings and probation
officers' pre-sentencing reports, which "serve a function
integral to the independent judicial process").  In contrast,
"those who play[] a role in initiating a prosecution--the
complaining witness--[do] not enjoy immunity."  White, 855 F.2d
at 958.  Therefore, to the extent that Ulahannan was not the
"person 'who actively instigated or encouraged [a] prosecution of
the plaintiff'" she is entitled to absolute immunity.  Kulas v.
Flores, 255 F.3d 780, 783 n.1 (9th Cir. 2001) (defining
complaining witness).

        Plaintiff bases his § 1983 claim on alleged violations
of his Fourth and Fourteenth Amendment rights.  With regard to
the Fourth Amendment, plaintiff alleges an unreasonable seizure
and detention of his son, Ammon.  However, plaintiff does not
have standing to claim a violation of his son's Fourth Amendment
right to be free of unreasonable seizure and therefore has no
claim based on this theory.  See Alderman v. United States, 394
U.S. 165, 174 (1969) (recognizing the "general rule that Fourth
Amendment rights are personal rights which, like some other

constitutional rights, may not be vicariously asserted"); <u>Mabe v. San Bernardino County Dep't of Pub. Soc. Servs.</u>, 237 F.3d 1101, 1111 (9th Cir. 2001) (same).[4]  As to the Fourteenth Amendment, plaintiff alleges that defendants interfered with his right to familial association by: (1) generating false reports, giving false testimony, hiding evidence, and distorting the child abuse investigation in an effort to keep Ammon out of plaintiff's custody; and (2) unlawfully seizing, detaining, and transporting his son to a WEAVE shelter.

### 1.   Ulahannan's False Reports and Testimony

Plaintiff alleges that, during the investigation into the abuse of Ammon and Kulwinder, Ulahannan generated false reports, gave false testimony, concealed evidence, and misrepresented the results of her investigation.[5]  (Compl. ¶ 13.) These claims appear to be based on the same factual predicate; namely that Ulahannan reported, and then testified in the Bhatti divorce proceedings, that some of her information about domestic abuse in the Bhatti household came from her interview with six-

---

[4]      Because plaintiff has a Fourteenth Amendment claim based on the same conduct, however, this distinction is largely irrelevant because "the same legal standard applies in evaluating Fourth and Fourteenth Amendment claims for the removal of children . . . ."  <u>Wallis v. Spencer</u>, 202 F.3d 1126, 1137 n.8 (9th Cir. 2000) (observing that "[t]he claims of the parents [for the wrongful seizure of their children] should properly be assessed under the Fourteenth Amendment standard for interference with the right to family association").

[5]      Plaintiff also claims that his name was wrongly submitted to the Child Abuse Central Index, (compl. ¶ 13), but fails to identify the responsible actor.  In the absence of allegations or evidence that Ulahannan was directly involved, the court assumes that this event was at most a consequence of Ulahannan's allegedly false reports and not something that she personally accomplished.

year-old Ammon, which was purportedly conducted in Hindi.
Plaintiff maintains that Ammon did not speak Hindi, although his
mother testified that "he could understand a little Hindi because
Punjabi [his native tongue] and Hindi are pretty closely
related."  (Zal Decl. Ex. 3 (Kulwinder Dep. 12:1-3).)
Additionally, even plaintiff admits that Ammon "began to learn
the Hindi alphabet when he was about 4 [and a half] . . . ."
(Bhupat Bhatti Decl. ¶ 61.)

          As an initial matter, the court questions whether the
alleged conduct regarding Ulahannan's reports and testimony
actually violated plaintiff's constitutional rights, which is a
threshold question in a § 1983 case.  See Baker v. McCollan, 443
U.S. 137, 140 (1979) ("The first inquiry in any § 1983 suit . . .
is whether the plaintiff has been deprived of a right 'secured by
the Constitution and laws.'").  The Ninth Circuit has held that
"there is no constitutional due process right to have child
witnesses, in [an] . . . abuse investigation, interviewed in a
particular manner or pursuant to a certain protocol."  Devereaux
v. Perez, 218 F.3d 1045, 1053 (9th Cir. 2000).  Specifically, the
court in Devereaux rejected a parent's "claimed legal right to
have [an] . . . abuse investigation conducted in such a manner to
avoid leading questions, influencing or manipulating the child
witnesses, or eliciting inconsistent statements."  Id. at 1054.

          Under an extension of the Ninth Circuit's reasoning
then, the court would be justified in holding that even if
Ulahannan could barely communicate with Ammon and manipulated his
statements, this conduct did not violate plaintiff's rights under

1  federal law.[6]  The Constitution does not provide plaintiff with a
2  right to an error free abuse investigation.  <u>See</u> <u>Daniels v.</u>
3  <u>Williams</u>, 474 U.S. 327, 333 (1986) ("Where a government
4  official's act causing injury to life, liberty, or property is
5  merely negligent, no procedure for compensation is
6  constitutionally required." (quotation omitted)); <u>Watterson v.</u>
7  <u>Page</u>, 987 F.2d 1, 8 (1st Cir. 1993) ("The right to family
8  integrity clearly does not include a constitutional right to be
9  free from child abuse investigations.").

10        Even assuming that Ulahannan's conduct implicated
11 plaintiff's constitutional rights, however, she is nonetheless
12 entitled to absolute immunity for her conduct in reporting and
13 testifying about alleged domestic abuse in the Bhatti home.
14 Regarding her reporting activities, the court notes that absolute
15 immunity attaches when social workers are engaged in "quasi-
16 prosecutorial functions"--including instances "where a social
17 worker contributes as an advocate to an informed judgment by an
18 impartial decisionmaker." <u>Caldwell</u>, 928 F.2d at 333; <u>see also</u>
19 <u>Lebbos</u>, 348 F.3d at 823 (citing <u>Mabe</u> for the proposition that
20 "where there [are] allegations that social workers did not
21 conduct their investigation properly and submitted false evidence
22 during juvenile court proceedings, . . . social workers [are]

23

24        [6]   Although the court believes that <u>Devereaux</u> provides
   useful guidance, it is reluctant to base its decision entirely on
25 the observations of the court made therein because (1) the case
   involved the alleged <u>sexual</u> abuse of a child, a fact that the
26 court seemed particularly motivated by, and (2) the court was
   discussing the application of the qualified immunity doctrine,
27 and not more generally whether parents can base a § 1983 claim on
   an allegedly inadequate, if not corrupt, investigation into
28 accusations of abuse.

entitled to absolute immunity because their actions were part of
the initiation and pursuit of dependency proceedings"). 
Relatedly, several courts have recognized that in preparing
reports that will help the court in its fact-finding mission,
government officials act in a quasi-judicial capacity. Demoran
v. Witt, 781 F.2d 155, 157 (9th Cir. 1986) (probation officers);
Ward v. San Diego County Dep't of Soc. Sevs., 691 F. Supp. 238,
239, 241 (S.D. Cal. 1988) (guardian ad litem).  Underlying these
decisions is a recognition that "the threat of civil liability is
not necessary" because the "judicial system provides procedural
safeguards to protect against misconduct . . . ."[7]  Ward, 691 F.
Supp. at 240-41 (citing Meyers, 812 F.2d at 1158).  Consistent
with these decisions and policy considerations, absolute immunity
for Ulahannan's allegedly imperfect investigation and subsequent
reports is warranted.

        Regarding plaintiff's allegations that Ulahannan gave
false testimony and misrepresented the results of her
investigation while under oath in the family court proceedings,
she is likewise entitled to absolute immunity.  The Ninth Circuit
has recognized that prosecution for perjury, not the imposition
of civil liability, is sufficient to deter witnesses "from
inflicting constitutional injury through false testimony."  Holt
v. Castaneda, 832 F.2d 123, 125 (9th Cir. 1987) (quoting Briggs

---

        [7]    Indeed, in the proceedings at issue in this case, the
family court commissioner illustrated how the system is designed
to keep false reports in check when he determined that
Ulahannan's reports were "unfounded" and "not to be used or
considered in further evaluations or mediations."  (Zal Decl. Ex.
4 (In re Bhatti, No. 03-FL-05779, slip op. ¶¶ 6, 8 (Cal. Super.
Ct. June 14, 2004).)

1  v. Goodwin, 569 F.2d 10, 54 (D.C. Cir. 1977)).  In the context of

2  a § 1983 suit, Ulahannan's testimonial acts, performed in an

3  adversarial proceeding, constituted protected activities and she

4  is therefore entitled to absolute immunity for this conduct.

5            2.  Ulahannan's "Removal" of Ammon from the Bhatti

6                Residence

7            Regarding plaintiff's claim of interference with

8  familial association arising out of the transportation of Ammon

9  from the Bhatti residence to the WEAVE shelter, defendants

10  maintain that Ulahannan is entitled to qualified, rather than

11  absolute, immunity.[8]  The applicability of qualified immunity is

12  determined through a two-step inquiry where the court asks: "(1)

13  whether, 'taken in the light most favorable to the party

14  asserting the injury, the facts alleged show the officer's

15  conduct violated a constitutional right'; and, if a violation of

16  a constitutional right [can] indeed be found, (2) 'whether the

17  right was clearly established.'"  Sissoko v. Rocha, 412 F.3d

18  1021, 1038 (9th Cir. 2005) (quoting Saucier v. Katz, 533 U.S.

19  194, 201 (2001)).  In other words, qualified immunity shields

20

21            [8]  Plaintiff describes a more complicated "conspiracy" in
    which Ulahannan allegedly planned to take Kulwinder and Ammon to
22  a relative's house in Oakley, California, where others would
    assist Kulwinder in a scheme to take Ammon back to India.  (Pl.'s
23  SUF No. 86.)  However, discovery is complete in the case and
    plaintiff has not produced any evidence that Ulahannan delivered
24  Kulwinder and Ammon to a destination other than her CPS office or
    the WEAVE shelter, where she eventually left them.  (July 14,
25  2005 Scheduling Order 2 (closing discovery on February 15,
    2006).)  Therefore, based on the facts before this court,
26  Ulahannan's conduct appears to have been in accordance with state
    procedures for responding to domestic violence accusations.  See
27  Cal. Welf. & Inst. Code § 18294(h) (permitting social services
    workers to provide "[e]mergency transportation to the shelter,
28  and when appropriate, arrangements with local law enforcement for
    assistance in providing such transportation").

                                13

government officials from liability for a violation of
plaintiffs' rights if "the official[s] objectively could have
believed the conduct was lawful." <u>Ram v. Rubin</u>, 118 F.3d 1306,
1310 (9th Cir. 1997) (involving the qualified immunity of a
social worker and a police officer); <u>see also</u> <u>Devereaux</u>, 218 F.3d
at 1059 (Kleinfeld, J., dissenting) ("The question, in a
qualified immunity legal analysis, boils down to 'Should they
have known better?'").  Significantly, <u>plaintiff</u> bears the burden
of establishing that the claimed constitutional right was
"clearly established" at the time of the allegedly illegal
conduct.  <u>Maraziti v. First Interstate Bank</u>, 953 F.2d 520, 523
(9th Cir. 1992).

        The right claimed by plaintiff, the right to familial
association, is a recognized substantive due process right
unquestionably protected by the Fourteenth Amendment.  <u>Lee v.
City of L.A.</u>, 250 F.3d 668, 685 (9th Cir. 2001) ("It is well
established that a parent has a 'fundamental liberty interest' in
'the companionship and society of his or her child' and that
'[t]he state's interference with that liberty interest without
due process of law is remediable under [42 U.S.C. §] 1983.'"
(quoting <u>Kelson v. City of Springfield</u>, 767 F.2d 651, 654-55
(9th. Cir. 1985)) (alterations in original)).  Decidedly less
clear, as discussed above, is how this right can be violated,
given that a parent's interest in the care, custody, and
management of their child is not absolute.  <u>Caldwell</u>, 928 F.2d at
333.  A government actor can interfere with familial association
in a reasonable manner depending on the strength of the
government's interest in the situation.  <u>See</u> <u>Smith v. City of</u>

1   Fontana, 818 F.2d 1411, 1418 (9th Cir. 1987); see also, e.g.,

2   Wallis, 202 F.3d at 1138 (requiring reasonable cause to believe a

3   child is in imminent danger before government officials can

4   remove that child from its parent's custody); Frazier v. Bailey,

5   957 F.2d 920, 931 (1st Cir. 1992) (acknowledging the substantive

6   due process right to familial association must always be balanced

7   against the government interest involved).  Moreover, "[t]he

8   Fourteenth Amendment does not protect against all deprivations of

9   liberty, 'only against deprivations of liberty accomplished

10  without due process of law.'"  Devereaux, 218 F.3d at 1053

11  (quoting Baker, 443 U.S. at 145).

12          Here, Ulahannan's conduct did not unreasonably

13  interfere with the Bhatti family's ability to associate.  First,

14  Ulahannan believed that an emergency situation existed, based on

15  allegations of domestic abuse made by Kulwinder and under such

16  circumstances, her interference was warranted.  See Caldwell, 928

17  F.2d at 333 ("In an emergency situation, a state agency may

18  remove children from their parents' custody when the children are

19  subject to immediate or apparent danger or harm.").  Second,

20  Ulahannan did not actually remove Ammon from parental custody, as

21  he remained in the physical custody of his natural mother at all

22  times.  (Kulwinder Decl. ¶¶ 6-7.)  Additionally, neither

23  Kulwinder nor Ammon were detained, seized, or otherwise held

24  against their will by government officials when Kulwinder

25  requested and accepted an offer of transportation away from an

26  allegedly abusive environment.  (Id. ¶ 6); see Caldwell, 928 F.2d

27  at 334 (implicitly holding that a social worker does not violate

28  a parent's right to family integrity by removing a child from one

15

custodial parent's custody and placing the child with another person who has legal custody rights); see also Cal. Welf. & Inst. Code § 309(a) (outlining the required procedures that must be followed immediately after a child is taken into temporary custody and, significantly, noting that the social worker's procedural obligations are fulfilled once she releases the child to a parent). Ulahannan consequently did not violate plaintiff's Fourteenth Amendment rights by transporting Ammon to the WEAVE shelter.

Moreover, even if Ulahannan's actions had violated plaintiff's constitutional rights, plaintiff has cited no authority for the proposition that separating a child and one of his custodial parents from the other custodial parent who has been accused of domestic abuse violates a clearly established constitutional right. Cf. Manzano v. S.D. Dep't of Soc. Servs., 60 F.3d 505, 511 (8th Cir. 1995) ("[T]he parental liberty interest in keeping the family unit intact is not a clearly established right in the context of reasonable suspicion that parents may be abusing children." (citation omitted)); Callahan v. Lancaster-Lebanon Intermediate Unit 13, 880 F. Supp. 319, 329 (E.D. Pa. 1994) (commenting that "in the context of child care workers investigating and bringing child abuse proceedings, there are no 'clearly established' substantive due process rights held by parents"). Absent such authority, Ulahannan could have objectively believed that her actions were reasonable.

Specifically, Ulahannan acted on what she believed to be statements from Kulwinder and Ammon that plaintiff was abusive. (See Ulahannan Decl. ¶ 6; Ex. B 4-5.) She then provided

16

emergency transportation as prescribed by California Welfare and Institutions Code § 18294.  Cal. Welf. & Inst. Code § 18294(h) ("Such programs shall be designed to provide the following basic services to victims of domestic violence and their children: . . . (h) Emergency transportation to the shelter and, when appropriate, arrangements with local law enforcement for assistance in providing such transportation."); see also Caldwell, 928 F.2d at 334 (noting that when a social worker acts consistently with a state statute, this is an important consideration in deciding whether the social worker violated a clear constitutional right).  Finally, she pursued this course of action with support from her supervisor and the program manager, suggesting that other social workers would have followed the same, objectively reasonable, course of conduct.  (Id. ¶ 6.) Again, in the absence of any authority suggesting otherwise, which it was plaintiff's burden to produce, the court fails to see how these actions violated plaintiff's clearly established constitutional rights.  Ulahannan is consequently entitled to qualified immunity for the transportation of Ammon and his mother to the WEAVE shelter.

### 3.   Liability of Defendant County Under § 1983

Although defendant Ulahannan is entitled to immunities, these personal exemptions do not extend from the individual government official to the municipality for which she works. Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993) ("[U]nlike various government officials, municipalities do not enjoy immunity from suit--either absolute or qualified--under § 1983.").

17

1   Nevertheless, "a municipality cannot be held liable <u>solely</u>

2   because it employs a tortfeasor--or, in other words, a

3   municipality cannot be held liable under § 1983 on a <u>respondeat</u>

4   <u>superior</u> theory." <u>Monell</u>, 436 U.S. at 691.  With respect to

5   claims against the county, plaintiff must instead allege that (1)

6   the violation was committed pursuant to a formal county policy or

7   a "longstanding practice or custom which constitutes the

8   'standard operating procedure' of the local governmental entity",

9   <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989); (2)

10  the individual who committed the tort was an official with final

11  decision-making authority, <u>Pembaur v. City of Cincinnati</u>, 475

12  U.S. 469, 480-81 (1986); or (3) an official with final

13  decision-making authority ratified a subordinate's action and its

14  basis, <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988).

15  <u>See also</u> <u>Anthony v. County of Sacramento</u>, 898 F. Supp. 1435, 1451

16  (E.D. Cal. 1995).  Additionally, "plaintiff must demonstrate that

17  the official policy 'evidences a "deliberate indifference"' to

18  his constitutional rights." <u>Oviatt v. Pearce</u>, 954 F.2d 1470,

19  1477 (9th Cir. 1992) (quoting <u>City of Canton v. Harris</u>, 489 U.S.

20  378, 389 (1989)).

21        Plaintiff bases his § 1983 claim on the policy or

22  custom theory of municipal liability and further contends in his

23  opposition to this motion that defendant County, through

24  Ulahannan's supervisor's actions, ratified her conduct. (Compl.

25  ¶¶ 7, 15, 16.; Pl.'s Opp'n to Defs.' Mot. for Summ. J. 46.)  In

26  support of these arguments, plaintiff has conceived of five

27  policies that "<u>if</u> shown to exist" amount to deliberate

28  indifference to plaintiff's constitutional rights. (Pl.'s Opp'n

to Defs.' Mot. for Summ. J. 45 (emphasis added).)  Specifically, plaintiff maintains that the following policies led to deprivation of his rights: (1) "A policy of failing to train [Ulahannan] and her supervisors"; (2) "A policy of allowing and supporting the violations of parents' rights by social workers"; (3) "A policy of covering up the violations of parents' rights by social workers"; (4) "A policy of falsifying evidence"; and (5) "A policy of committing perjury and condoning perjury."  (Id.) In support of these theories, plaintiff does not direct the court to any tangible county policy but instead contends that the Ulahannan's supervisors, whom she consulted, "may be fairly said to represent the official policy of Sacramento County."  (Pl.'s Opp'n to Defs.' Mot. for Summ. J. 46.)  Alternatively, plaintiff contends that a custom can be inferred from the County's suspected failure to discipline or reprimand Ulahannan.  (Id. at 47.)

### a.   Acts by a Final Policymaker

Contrary to plaintiff's arguments, "supervisor" is not inherently synonymous with "final policymaker."  Rather, a final policymaker, for purposes of § 1983 municipal liability, is "some official or body that has the responsibility for making law or setting policy in any given area of a local government's business."  Praprotnik, 485 U.S. at 124.  Significantly, plaintiff has not provided any legal support, and merely assumes, that plaintiff's supervisor, Fermin Perez, and Melinda Lake, the Emergency Response Program Manager consulted during Ulahannan's response, serve in such a capacity.  Although "the identification of policymaking officials is not . . . a question

of fact in the usual sense," at a minimum the party seeking to
avoid summary judgment must provide the court with the titles of
those involved so that it can evaluate the viability of the non-
movant's claims.  See id. at 124-25 (holding that "the
identification of policymaking officials is a question of state
law").  Plaintiff has not even provided this basic information
for Perez.  Consequently, because plaintiff has failed to meet
his burden, the court cannot deny summary judgment based on his
final policymaker arguments.

b.   Failure to Reprimand

Alternatively, plaintiff attempts to create a question
of fact as to whether his injuries were the result of a county
policy by arguing that the County ratified Ulahannan's conduct
when it allegedly failed to reprimand Ulahannan or "admit that
[her] conduct was in error."  (Pl.'s Opp'n to Defs.' Mot. for
Summ. J. 47.)  Generally, "isolated instances of official
misconduct are insufficient to establish municipal liability
under Monell."  Henry v. County of Shasta, 132 F.3d 512, 519 (9th
Cir. 1997) (citing Oklahoma City v. Tuttle, 471 U.S. 808 (1985)).
However, the Ninth Circuit has held that failure to fire or
reprimand officers in light of "a blatantly unconstitutional
course of treatment" can serve as "persuasive evidence of
deliberate indifference or of a policy encouraging such official
misconduct."  Id. at 520.

In Henry, several officers were involved in an incident
where the plaintiff was held naked in a urine-stained padded
cell, paraded through the station house naked, and made to suffer
other indignities in an effort to get him to sign his traffic

20

ticket.  <u>Id.</u>  Additionally, two other individuals testified that they had experienced similar treatment in the months following the plaintiff's arrest.  <u>Id.</u> at 518.  Despite having been sued for "a blatantly unconstitutional course of treatment" perpetrated by a host of officers, the municipality did not take any disciplinary action.  <u>Id.</u> at 520.  Based on these circumstances, the Ninth Circuit held that "[w]hen a county continues to turn a blind eye to <u>severe violations</u> of . . . constitutional rights--despite having received notice of such violations--a rational fact finder may properly infer the existence of a previous policy or custom of deliberate indifference."  <u>Henry v. County of Shasta</u>, 137 F.3d 1372 (9th Cir. 1998) (amended opinion).

However, as the emphasized language suggests, the Ninth Circuit has applied this rule only "when there were very clear instances of abuse and gross recklessness."  <u>Harrington v. City of Napa</u>, No. C 04-00958, 2005 WL 1656883, at *8 (N.D. Cal. July 14, 2005).  Moreover, the Ninth Circuit has subsequently noted that failure to discipline a municipal actor for an isolated incident does not, standing alone, constitute ratification.  <u>Haugen v. Brosseau</u>, 351 F.3d 372, 393 (9th Cir. 2003) (citing for support <u>Santiago v. Fenton</u>, 891 F.2d 373, 382 (1st Cir. 1989), where the First Circuit "refus[ed] to hold that the 'failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under <u>Monell</u>'")), <u>rev'd on other grounds</u>, <u>Brosseau v. Haugen</u>, 543 U.S. 194 (2004); <u>see also</u> <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1348 (9th Cir. 1992) (observing that "fail[ure] to overrule the unconstitutional

1   discretionary acts of subordinates would simply smuggle

2   respondeat superior liability into section 1983 law").

3   Therefore, Henry should not be broadly read to support the

4   proposition that "post-event evidence . . . of a municipal

5   defendant's policy or custom" can be used to create an issue of

6   fact sufficient to defeat a motion for summary judgment. Henry,

7   132 F.3d at 519.  The holding is limited by its plain language to

8   circumstances where officers "blatantly" violated constitutional

9   rights.

10          As already noted, the court has doubts that plaintiff's

11  constitutional rights were even violated here.  Accordingly, any

12  violation here was not blatant.  Moreover, despite having the

13  opportunity to depose Ulahannan, plaintiff has not presented any

14  evidence that she was or was not reprimanded.  He offers only

15  speculation, which is insufficient to create a question of fact.

16  (See  Pl.'s Opp'n to Defs.' Mot. for Summ. J. 47 (noting only

17  that "defendants have presented no evidence that [Ulahannan] was

18  even reprimanded")); Karam v. City of Burbank, 352 F.3d 1188,

19  1194 (9th Cir. 2003) (noting that "speculation . . . does not

20  rise to the level of evidence sufficient to survive summary

21  judgment").  Therefore, given that plaintiff has failed to show

22  that the County had an actual policy that violated his rights or

23  that, in ratifying Ulahannan's conduct, the County implicitly

24  adopted such a policy, summary judgment for the County is

25  warranted.

26  ///

27  ///

28  ///

1    C.    <u>Remaining State Law Claims</u>

2         Section 1367(c)(3) allows a district court to decline

3    to exercise supplemental jurisdiction over a state law claim

4    where, as here, "the district court has dismissed all claims over

5    which it has original jurisdiction . . . ."  28 U.S.C. §

6    1367(c)(3).  Factors for the court to consider in deciding

7    whether to dismiss supplemental state claims include judicial

8    economy, convenience, fairness, and comity.  <u>Imagineering, Inc.</u>

9    <u>v. Kiewit Pac. Co.</u>, 976 F.2d 1303, 1309 (9th Cir. 1992).  "[I]n

10   the usual case in which federal law claims are eliminated before

11   trial, the balance of factors . . . will point toward declining

12   to exercise jurisdiction over the remaining state law claims."

13   <u>Reynolds v. County of San Diego</u>, 84 F.3d 1162, 1171 (9th Cir.

14   1996) <u>overruled on other grounds by</u> <u>Acri v. Varian Assocs., Inc.</u>,

15   114 F.3d 999, 1000 (9th Cir. 1997).  On prior occasions, this

16   court has noted that some circuits have gone even farther and

17   held that, absent extraordinary or unusual circumstances, federal

18   courts should not retain jurisdiction.  <u>See, e.g.</u>, <u>Musson</u>

19   <u>Theatrical, Inc. v. Fed. Express Corp.</u>, 89 F.3d 1244, 1255 (6th

20   Cir. 1996); <u>Wentzka v. Gellman</u>, 991 F.2d 423, 425 (7th Cir.

21   1993).

22        While litigation of a new suit in state court may

23   somewhat inconvenience plaintiff, plaintiff has not argued that,

24   in the event that the court decides to dismiss his federal

25   claims, extraordinary or unusual circumstances nevertheless

26   support continued federal jurisdiction.  Accordingly, the court

27   declines to exercise supplemental jurisdiction under 28 U.S.C. §

28   1367(c)(3) as to the remaining state law claims.

1          IT IS THEREFORE ORDERED that defendants' motion for

2    summary judgment be, and the same hereby is, GRANTED.

3    DATED:  May 31, 2006

4

5

6                                    WILLIAM B. SHUBB
                                     UNITED STATES DISTRICT JUDGE
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24